IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WALID ALAWI,  )<br>  )<br>    Plaintiff,  )<br>  )<br>    vs.  )<br>  )<br>KILOLO KIJAKAZI  )<br>ACTING COMMISIONER OF  )<br>SOCIAL SECURITY,  )<br>  )<br>    Defendant.  )<br>  ) | CASE NO.  1:22-CV-00800-JDG<br><br>MAGISTRATE JUDGE<br>JONATHAN D. GREENBERG<br><br>**MEMORANDUM OF<br>OPINION AND ORDER** |

Plaintiff, Walid Alawi ("Plaintiff" or "Alawi"), challenges the final decision of Defendant, Kilolo Kijakazi, Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"),42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

**I.     PROCEDURAL HISTORY**

In October 2019, Alawi filed an application for SSI.  (Transcript ("Tr.") at 21, 72)  Alawi's application alleged a disability onset date of July 25, 2016, and claimed he was disabled due to back disorders. (Tr. 68)  Alawi's applications were denied initially and upon reconsideration, and Alawi requested a hearing before an administrative law judge ("ALJ").  (Tr. 69-75, 90, 103, 106, 151).

On March 16, 2021, ALJ George Roscoe held a telephonic hearing where Alawi's counsel appeared and an impartial vocational expert ("VE") testified.  (Tr. 36-45).  Alawi did not appear for the

1

hearing and Alawi's counsel represented that he did not know the reason for Alawi's absence. (Id.) On April 20, 2021, the ALJ issued a written decision finding Alawi was not disabled. (Tr. 16-31). The ALJ's decision became final on March 14, 2022, when the Appeals Council declined further review. (Tr. 3)

On May 17, 2022, Alawi filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 9, 10). Alawi asserts the following assignments of error:

> `(1) Whether the ALJ erred in misstating the evidence, and thus substantial evidence does not support the ALJ decision.
> (2) Whether the ALJ substituted his own opinion for those of medical experts regarding medical evidence.
>
> (3) Whether the ALJ failed to provide an explanation as to how some limitations were excluded from the Claimant's assigned Residual Functional Capacity.

(Doc. No. 9 at 1).

## II. EVIDENCE

**A. Personal and Vocational Evidence**

Alawi was born in 1986 and was 33 years old on the date his application was filed, making him a "younger" individual age 18-49 under social security regulations. (Tr. 30) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). He has a high school education and is able to communicate in English. (Id.) Alawi has no past relevant work. (Id.)

**B. Relevant Medical Evidence[1]**

1. Physical Impairments – Treatment Notes

---

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

2

While at work in July 2016, Alawi sustained three gunshot wounds—one in his upper left chest and two in his abdomen. (Tr. 237, 1262) He also injured his head on a safe after he fell backwards attempting to wrestle the gun from the assailant. (Tr. 237) He was taken to Metro Health's emergency room and stabilized. (Tr. 1245) Alawi remained hospitalized for six days and was provided physical and occupational therapy until his condition had improved enough for him to be discharged (Tr. 1254, 1254, 1262, 1271, 1272-1281). Upon discharge, Mr. Alawi was ordered to attend follow-up physical and occupational therapy appointments to improve his functioning.

Alawi underwent a course of physical therapy in 2016 and 2017 at Broadway Orthopaedics & Sports Medicine. (Tr. 227-272) During physical therapy, Alawi reported neck, shoulder, and upper back pain that worsened with lifting, carrying, and looking up. (Tr. 266, 67, 268) In February 2017, it was reported that lifting a 1- pound box was "very challenging to him." (Tr. 251)(emphasis in original). In April 2017, he underwent a re-evaluation, Alawi reported experiencing radicular pain in his left T4 (the site of a bullet exit wound), as well as weakness and decreased functioning in his left shoulder. (Tr. 237) It was noted that all of Alawi's treatment goals were met including 180 degrees of flexion (raising his arm in front of his body) and abduction (raising his arm to the side of his body) in his left shoulder and he exhibited good (4+/5) strength in his left shoulder and left wrist. (Tr. 238) It was recommended Alawi enter a "work conditioning program" to increase his physical demand level to pre-injury level. (Id.) In May 2017, Alawi was also referred to a neurologist due to ongoing pain. (Tr. 227) In May 2018, Alawi had a CT Scan of his chest which noted that small bullet fragments remained in his left side. (Tr. 328)

Alawi also established care with a pain management doctor, Hyo Kim, M.D., following the 2016 shooting. (Tr. 1755) On his initial examination, Alawi exhibited tenderness and muscle spasms in his spine and limited range of motion in his left shoulder. (Tr. 1756) Alawi reported he could not work due to persistent pain. (Id.) He continued to treat with Dr. Kim in 2017, with continued complaints of chest and

3

back pain and difficulty raising his left arm (Tr. 1757, 1759, 1761, 1763, 1765, 1767, 1769, 1771, 1773, 1775) In April 2017, Dr. Kim reported that Claimant's abduction was only 75 degrees and his flexion was 80 degrees (Tr. 1763). Alawi continued to receive pain management treatment from Dr. Kim through 2020 for his chest and upper back pain and difficulty using his left arm (Tr. 1518, 1523, 1529, 1536, 1541, 1553, 1559, 1579, 1599). In 2020, Dr. Kim recorded multiple instances of limited active range of motion in Alawi's left shoulder and spinal tenderness (Tr. 1518, 1519, 1523). An August 2020, EMG, noted a "very severe degree" of left radial mononeuropathy and an August 2020 exam found gait difficulties, as well as a 0/5 strength in left wrist extension and a 2/5 in grip weakness. (Tr. 2091, 2095-96) In October 2020, Alawi obtained a consult for the treatment of left-hand weakness and wrist drop that started approximately 3 months prior and had progressively worsened. (Tr. 2082) The consulting doctor opined that Alawi had a lesion of the left radial nerve and modest/mild chronic motor axon loss in the C6-7 in the cervical spine (Tr. 2091-2093).

Alawi was born with spina bifida. (Tr. 489) He also has a a long history of congenital hydrocephalus (a buildup of fluid in the brain) and had a shunt implanted around the age of one. (Tr. 649) He experienced multiple shunt infections. (Tr. 329) Alawi had shunt revisions in 2000 and 2014 and two different shunt replacements in 2019. (Tr. 303, 349, 392, 533, 1605) Despite the surgeries, Alawi continued to complain of headaches, nausea, and vomiting resulting in several emergency room visits (Tr. 303, 306, 329-30, 337, 348, 373, 392, 1980, 2108). In spring 2021, Alawi underwent a cervical myelogram, which found a three-millimeter tonsillar descent (movement of the brain tissue from one compartment to the other). (Tr. 58, 63, 67). MRIs were also obtained of Alawi's cervical spine, which noted low lying cerebellar tonsils and minor degenerative changes of the upper spine. (Tr. 65) Continued monitoring was recommended. (Id.) In addition to the conditions discussed above, Alawi was diagnosed with sinus arrhythmia during the alleged period of disability (Tr. 902)

2. **Mental Impairments – Treatment Notes**

Alawi began treating with Patrick S. Yingling, Psy.D. in August 2017, after being referred by his primary care physician due to concerns about post-traumatic stress disorder related to the 2016 shooting. (Tr. 1603). At that time Alawi endorsed depression, feelings of guilt, mood swings, social withdrawal, sleep impairment, fatigue, lack of appetite, intrusive racing thoughts and flashbacks, low self-esteem, and lack of motivation. (Tr. 1606-09.) On examination, his mood was down and his affect was flat and dysphoric. (Tr. 1606) He was also cooperative, able to complete serial threes (a test of attention and concentration), and displayed intact social judgment. (Tr. 1606). He was administered the Beck Depression Inventory, which was consistent with severe depression. (Tr. 1607) Dr. Yingling diagnosed depression and stated that Alawi's symptoms prevented him from returning to his previous job. (Tr. 1609).

Throughout 2018 and 2019, Dr. Yingling completed a number of forms for the bureau of workers' compensation ("BWC") stating that Alawi was unable to perform his past job at that time due to major depressive disorder. (Tr. 1145-49, 1152-57, 1162-66, 1188, 1520, 1522, 1524, 1613-15, 1626, 1628, 1630). Dr. Yingling also offered a letter in support of Alawi's application for disability benefits in July of 2019 (Tr. 1139). Dr. Yingling's letter diagnosed Alawi with a post-traumatic stress disorder brought on by the events of the shooting in 2016. (Tr.1139, 1140). The letter states that Alawi had attended regular counseling sessions and had been a "very active" participant in his treatment with a desire to improve his mental health. (Tr.1141) Dr. Yingling concluded that the "magnitude" of the shooting injuries and the resulting limitations had caused Mr. Alawi to experience "significant" trauma related symptoms (Id.). Dr. Yingling opined that these symptoms were "temporarily and totally disabling." (Id.) Alawi reported completing activities of daily living only when he had appointments and was required to leave the house. (Tr. 1176, 1190, 1204, 1238). In some reports, Dr. Yingling describes Alawi's depression as causing "vegetative symptoms" (Tr. 1178, 1190, 1238). Dr. Yingling also expressed concern that Alawi lacked social support. (Tr. 1208, 1236).

In August of 2019, Alawi endorsed suicidal ideation and reported that he had experienced suicidal thoughts since the 2016 shooting. (Tr. 307). Alawi continued treatment with Dr. Yingling throughout 2020. The treatment notes from this time period note that Alawi showed improvement in his depression and maintaining focus. (Tr. 1516, 1736, 1744) In February, March, and April 2020, Alawi remained depressed, but it was reported that he had improved mood, improved ability to manage stressors, and had been maintaining focus despite his depression. (Id.) In April 2020, it was noted that Alawi had improved his personal hygiene and self-care, and had been maintaining contact with friends. (Tr. 1744)

Alawi also received treatment from psychiatrist Zinqvi Goubar, M.D. At the first visit in the record—a follow up visit in October 2018—Claimant's mood was down, he had low energy, a blunted affect and limited insight, but he was appropriately dressed, had good eye contact, was cooperative, had normal but somewhat slow speech, organized thoughts, and intact judgment (Tr. 1585). The next month, Alawi reported increased depressed, but was presented as cooperative with organized thoughts, normal speech, good insight, and intact judgment. (Tr. 1587-88) In December, Alawi expressed continued depression and lack of interest. (Tr. 1589) He presented as appropriately dressed, cooperative, had normal speech, organized thoughts, and intact judgment. (Tr. 1590) In March 2019, Alawi reported depression, anxiousness, irritation, and frustration. (Tr. 1552). Other than limited insight, his mental status exam was unremarkable. (Id.)

3. **Physical Impairments – Medical Opinions**

*Treating Source*

Alawi's primary care provider, Dr. Kim, completed a medical source statement in February 2020 and opined that Alawi could lift 10 pounds occasionally and 5 pounds frequently; sit, stand, and walk without limitation; occasionally perform all postural activities; and occasionally reach and push

6

and pull. (Tr. 1511-12) Dr. Kim also opined Alawi should avoid heights, moving machinery, and temperature extremes due to his prescribed pain medication. (Id.)

*State Agency Consultants*

In January 2020, James Cacchillo, M.D., reviewed the medical record and found Alawi had the following exertional limitations: lift and/or carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk or sit for 6 hours in an 8-hour workday; only occasional climbing ladders, ropes, or scaffolds. (Tr. 73-74, 87-89). Dr. Cahillo stated that he based his conclusions on Alawi's Spina bifida. (Tr. 73-74) In May 2020, Rebecca R. Neiger, M.D., affirmed Dr. Cacchillo's physical findings. (Tr. 88)

4. **Mental Impairments – Medical Opinions**

*Treating Source*

In addition to the BWC reports discussed above, in January of 2020, Dr. Yingling provided an opinion on Alawi's mental capacity (Tr. 1239, 1240). This evaluation found Alawi's abilities for concentration, persistence, and pace and adapting or managing oneself as "marked" or "extreme." (Id.). Dr. Yingling also opined that in some ways Alawi's ability to interact with others and understand, remember, and apply information were "marked" or "extreme." (Id.) Dr. Yingling attributed these limitations to Alawi's major depressive and posttraumatic stress disorders that were brought about by the 2016 shooting. (Tr. 1240)

In April 2021, Dr. Yingling provided a second evaluation of Alawi's mental capacity. (Tr. 52-53) The second assessment reflected a slight improvement in Alawi's mental health. Nonetheless, Dr. Yingling still found Alawi had "marked" impairment in 14 out of 32 categories assessed. Alawi received moderate to marked scores in this ability to interact with others. He also received mostly "marked" scores in his ability to maintain concentration, persistence, and pace. (Tr. 53).

*State Agency Consultants*

7

State agency consultant, David Dietz, Ph.D., reviewed Alawi's medical file in January 2020. (Tr. 69-75) Dr. Dietz found that the record was insufficient to determine Alawi's mental capabilities because Alawi did not return any forms and neither he nor his representative returned calls (Tr. 72, 84). In May 2020, Irma Johnson, Psy.D., stated she still had not received record evidence demonstrating Alawi's mental capabilities and, therefore, also found the record was insufficient to make a mental health determination.

**C.     Hearing Testimony**

Alawi did not appear for the March 16, 2021, hearing. (Tr. 38) The ALJ stated that Alawi constructively waived his presence. (Id.) Alawi's counsel testified that Alawi suffers from congenital hydrocephalus with associated vision impairment. (Tr. 39-40) Alawi experiences chronic pain from a gun short wound to the upper body that occurred in July 2016. (Id.) Counsel asserted that Alawi is incapable of work based on the combination of his cervical and psychological impairments. (Tr. 40)

VE, Suman Srinivasan, also testified at the hearing. (Tr. 40- ). The ALJ posed three hypothetical scenarios to the VE about whether a hypothetical individual of Alawi's age and education could work and, if so, what types of jobs could they perform with the following theoretical limitations:

1.     Sedentary work: no climbing of ladders ropes, or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; occasional overhead reaching without limitation of lateral reaching of the left upper extremity, frequent handling and fingering of the left upper extremity without limitation of the right up extremity at all; no exposure to hazards like heights, machinery, commercial driving; routine tasks in low stress environment; no fast pace, strict quotas, or frequent duty changes, involving superficial interpersonal interactions with coworkers and supervisors, specifically no arbitration, negotiation, or confrontation, and no interaction with the public as a job requirement. (Tr. 41-42)
   - The VE testified that the following jobs would be available: document specialist, surveillance system monitor, touchup screener. (Tr. 42)
   - The VE clarified that the DOT and SCO do not distinguish between climbing ladders, ropes, scaffolds, ramps, and stairs; and do not address the frequency of interaction with the public or overhead reaching. Thus, the VE asserted that he used his education, training, and experience to address those issues. (Tr. 43)

2.     The ALJ then added to hypothetical #1 that the individual would be either off task at

> least 20 percent of the time or absent two or more days a month on a continuing basis. (Id.)
> - The VE testified that there would be no jobs available because employees typically only allow 10 percent of off task time and an absence of once a month. (Tr. 43-44)

3. The ALJ then started again with hypothetical #1 and added a limitation that the individual could only on occasion handle and finger with the left upper extremity.
    - The VE testified that only the surveillance monitor job would be available. (Tr. 43)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is

9

expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 28, 2019, the application date (20 CFR 416.971 *et seq*.)

2. The claimant has the following severe impairments: congenital hydrocephalus, status post shunt placement and revisions, with history of headaches; history of abdominal gunshot wound injuries with fractured left clavicle and rib; left shoulder sprain; obesity; history of spina bifida with back pain; depressive disorder; and anxiety disorder with posttraumatic stress (20 CFR 404.1520(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 416.945) to perform sedentary work as defined in 20 CFR 416.967(a), except for no climbing of ladders, ropes or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; occasional overhead reaching without limitation of lateral reaching of the left upper extremity, without limitation of the right upper extremity; frequent handling and fingering with the left upper extremity without limitation of the right upper extremity; no exposure to hazards (heights, machinery, commercial driving); and mental limitation that he perform routine tasks in a low stress environment (no fast pace, strict quotas of frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation, or confrontation), and no interaction with the public as a job requirement (20 CFR 416.969a).

6. The claimant has no past relevant work (20 CFR 416.965).

7. The claimant was born on August 30, 1986, and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from October 28, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 16-31)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston*

*v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Alawi presents three assignments of error for the courts review. First, Alawi argues that the ALJ erred in misstating the evidence, and thus substantial evidence does not support the ALJ's decision. Second, Alawi asserts that the ALJ substituted his own opinion for those of medical experts. Third, Alawi argues that the ALJ erred by failing to explain how certain limitations were excluded from his Residual Functional Capacity. (Doc No. 9 at 13)

**Remand is required because the ALJ failed to explain his physical RFC determination**

In his Third Assignment of Error, Alawi argues that the ALJ erred when formulating the physical limitations in Alawi's RFC. Alawi urges that the ALJ "cherry picked' evidence by excluding certain physical limitations from Alawi's RFC without adequate explanation or reasoning. Doc. No. 9 at 17. Alawi asserts that the ALJ did not explain why he limited Alawi to only occasional "overhead reaching but without any limitation as to lateral reach" and why the ALJ "did not place any restrictions on [Alawi's] ability push and pull with his severely impaired left upper extremity." Id. at 18.

Dr. Kim opined that Alawi could perform occasional reaching, pushing, and pulling. (Tr. 1512) The ALJ found Dr. Kim's opinion overall "somewhat persuasive." (Tr. 28) With regard to physical impairments, the ALJ found that Alawi retained the RFC to:

> Perform sedentary work…except for no climbing of ladders, ropes or scaffolds, or crawling; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; occasional overhead reaching without limitation of lateral reaching of the left upper extremity, without limitation of the right upper extremity; frequent handling and fingering with the left upper extremity without limitation of the right upper extremity; no exposure to hazards (heights, machinery, commercial driving).

(Tr. 24) The RFC demonstrates that the ALJ adopted Dr. Kim's occasional overhead reaching limitation, except for finding that Alawi was not limited in lateral reaching. The RFC is silent on pushing and pulling limitations.

13

The Commissioner asserts that the ALJ "adequately explained why his RFC differed from Dr. Kim's opinion," but that is not accurate. Doc. No. 10 at 12. Both the ALJ decision and the Commissioner's brief are silent as to why the RFC does not include a pushing/pulling limitation. As to the lateral reaching issue, the Commissioner contends that the ALJ did not adopt a lateral reaching limitation because Alawi displayed full range of motion and full strength at some examinations. Doc. No. 10 at 12-13. (Tr. 28, 29) The Commissioner's position is consistent with the ALJ opinion. (Id.) However, Alawi displaying full range of motion and strength at some of his examinations does not explain or justify why the ALJ made a distinction between lateral and overhead reaching. Dr. Kim made no such distinction. The medical records the ALJ cites acknowledging that at times Alawi had "decreased strength and limited range of motion in his left shoulder" also make no distinction between lateral and overhead reaching.[2] (Tr. 29, citing B1F/12; B9F/7, 9, 11; B12F/71; B15F/1)

The ALJ's decision does not allow for adequate review by this Court because the ALJ does not build an accurate and logical bridge between the evidence and his RFC determination. "The assessment of the medical evidence conducted at a hearing is particularly important at Step 5 of the evaluation of a social security disability claim because the RFC articulated by the ALJ will be used by the vocational expert to assess the claimant's ability to perform work." *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (*quoting Ealy*, 594 F.3d 504, 516). "While the claimant bears the burden of proof during the first four steps, that burden shifts to the Commissioner in step five." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004) Here, the Court remands the Commissioner's decision because the ALJ's decision does not make clear (a) why the ALJ made a distinction between lateral and overhead reaching and (b) why Dr. Kim's pushing/pulling limitations were not incorporated into the RFC. *See Jackson v. Comm'r of Soc*. Sec., No. 5:21-CV-02409-CAB, 2022 WL 17084401, at *12 (N.D. Ohio Oct. 14, 2022), report and

---

[2] The examination notes state that Alawa was "unable to" or "had difficulty" raising his left arm.

14

recommendation adopted, No. 5:21-CV-02409-CAB, 2022 WL 17081337 (N.D. Ohio Nov. 18, 2022) (remanding because "the ALJ's decision does not allow for an adequate review by this Court."); *Wylds v. Comm'r of Soc. Sec.*, No. 3:21-CV-00365-JGC, 2022 WL 1541928, at *10 (N.D. Ohio Mar. 2, 2022) ("Because the ALJ's opinion does not permit the Court to follow the "reasoning and treatment of" opinion evidence in the record, the Commissioner's decision must be vacated and remanded for further proceedings."), report and recommendation adopted, No. 3:21-CV-365-JGC, 2022 WL 1539266 (N.D. Ohio May 16, 2022); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *8 (N.D. Ohio Apr. 4, 2012) (remanding where "the ALJ failed to properly articulate the RFC calculation," explaining that the Court was "unable to trace the path of the ALJ's reasoning"); *Flesicher v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)("The ALJ's failure to explain his decision deprived this court of a logical bridge between the evidence on the record and his conclusion.")(internal quotations omitted). Thus, remand is required.

As this matter is already being remanded, in the interest of judicial economy, the Court declines to reach Alawi's additional assignments of error.

## VII. CONCLUSION

For all of the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**


Dated: February 2, 2023                     *s/ Jonathan Greenberg*
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge